**FILED**

Jeanne A. Naughton, CLERK

**May 8, 2019**

United States Bankruptcy Court
Newark, NJ

By:  /s/ Margaret Cohen, Judicial Assistant

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| In re:<br>LINDA Y. JOHNSON-BATTLE,<br><br>                              Debtor. | Case No.:      16-15878  VFP<br><br>Chapter   7 |
| JIMMY SMITH,<br>                              Plaintiff,<br>v.<br>LINDA JOHNSON-BATTLE,<br>                              Defendant. | Adv. Pro. No.:  16-1723 VFP |

## <u>TRIAL OPINION</u>

<u>**APPEARANCES**</u>

JIMMY SMITH
1321 Iranistan Avenue
Bridgeport, CT  06605
Plaintiff *Pro Se*

DAVID JEROME WITHERSPOON, ESQ.
10 Hill Street, Ste. 20Y
Newark, NJ  07102
Attorney for Debtor/Defendant

**VINCENT F. PAPALIA, Bankruptcy Judge**

I.    **INTRODUCTION**

This is the Opinion of the Court following the August 29, 2018 trial on the remaining count of the amended adversary complaint (the "Complaint") filed by Jimmy Smith, plaintiff *pro se* (the "Plaintiff").  The Complaint seeks to except from discharge under 11 U.S.C. § 523(a)(2)(A) a debt owed to Plaintiff by Debtor/Defendant Linda Johnson-Battle (the "Debtor") in the amount of $8,088.23 arising from an April 13, 2015 Stipulation of Settlement (the "Stipulation").  Plaintiff proceeded *pro se*, but with the assistance of his son, who appeared at trial and participated in all pretrial proceedings.  Defendant was represented by counsel.[1]

The Plaintiff and Debtor entered into the Stipulation following a dispute between Plaintiff as landlord and Debtor as tenant.  In the Stipulation, the parties compromised Debtor's alleged obligation to the Plaintiff from $11,289 to $6,000 and agreed that the Debtor would pay $500 per month for twelve months, with Judgment to be entered in the amount of $11,289 (minus credits for payments) if the Debtor defaulted.  Plaintiff claims that he compromised the debt to $6,000 based on Debtor's representations that she was a single parent with one income.  Plaintiff alleged that Debtor's representations were demonstrably false because Debtor's husband lived with her at times, they remained married and he contributed to various expenses of the Debtor and their children.  Debtor claims that she compromised the debt because she did not believe that she owed the entire $11,289 and that she made no misrepresentations to the Plaintiff about her marital status or contributions from her husband, from whom she was informally separated.

---

[1] After trial, the parties requested that they be permitted to submit proposed findings of fact and conclusions of law. Various extensions of the related deadlines were requested and granted.  As a result, post-trial submissions were not completed until December 2018. (Trial Tr. 92:8-16, Aug. 29, 2018, Dkt. No. 44.)

The issue for this Court is whether Debtor induced the Plaintiff to enter into the Stipulation based on representations and omissions as to her marital status and her husband's financial contributions so that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The Court finds that the Debtor did induce the Plaintiff to enter the April 13, 2015 Stipulation by her misrepresentations that she was a single parent with one income, and by her failure to advise Plaintiff of the contributions of her husband and that Plaintiff justifiably relied on those representations and omissions.  Accordingly, the Court determines that the stipulated amount of $11,289, less $3,200.77 already paid to the Plaintiff leaving a balance of $8,088.23, is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

## II.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).  Venue is proper in this Court under 28 U.S.C. § 1408.  The Court issues the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III.    STATEMENT OF RELEVANT FACTS / FINDINGS OF FACT

### A.  The State Court Landlord Tenant Proceedings

The landlord-tenant history and related litigation history between and among Plaintiff, Debtor and Debtor's non-debtor, sometimes-estranged spouse, Marvin Battle, [Sr.] ("Mr. Battle"), is convoluted and somewhat obscure.  The Plaintiff provided a copy of the parties' lease (the "Lease") as an exhibit to his response to Debtor's Proposed Findings of Fact and Conclusions of

Law, but the Lease was not entered into evidence at trial.[2]    The Court will generally discuss the Lease as a matter of background, but that general discussion does not have any impact on the Court's decision.  The Lease commenced on November 26, 2004 for a one-year term and became month-to-month thereafter.[3]  The property address was 24 Eaton Place (no city given), and the rent was $1,550 per month.[4]  Debtor and Mr. Battle each signed the Lease, and the last page of the Lease represented that six minor children, aged 1-1/2 years to 14 years, would occupy the leased premises.[5]

Plaintiff commenced the collection action/landlord-tenant action that gave rise to the underlying debt in or about 2007 based on the failure to pay three months' rent and alleged damage to the premises.[6]  That action was captioned as *Jimmy Smith v. Marvin & Linda Battle*, Superior Court of New Jersey, Law Division, Special Civil Part, Dkt. No. DC-39698-07 (the "State Court Action").[7]  In 2008, Plaintiff obtained a default judgment in the amount of $11,289.[8]  Plaintiff initiated collection actions against both parties but was apparently not successful.  Years later, Debtor and Mr. Battle sought to vacate the default judgment based on improper service and were successful insofar as the State Court reopened the State Court Action with a new trial set for April 13, 2015.[9]

On April 13, 2015, the Plaintiff, represented by counsel, and Debtor only (not Mr. Battle), appearing *pro* se, entered a Stipulation that settled the State Court Action.  Both parties indicated

---

[2] (Pl.'s Resp., Ex. A, Dkt. No. 52.)
[3] (*Id.*)
[4] (*Id.*)
[5] (*Id.*)
[6] (Pl.'s Opp'n to Debtor's Mot. to Dismiss ¶¶ 9-10, Dkt. No. 7.)  By Order entered on January 31, 2017, Plaintiff's opposition was treated as an Amended Complaint, and certain counts of the Amended Complaint were dismissed. (Dkt. No. 10.)
[7] (D-3, Stip. of Settlement in State Ct. Action); (Pl.'s Proposed Findings, Ex. D, Dkt. No. 49.)
[8] (Pl.'s Opp'n to Debtor's Mot. to Dismiss ¶ 10, Dkt. No. 7.)
[9] (*Id.* at ¶¶ 11-14.)

that a mediator assisted Plaintiff and Debtor with the settlement.[10] The Stipulation required the

Debtor to pay Plaintiff a total of $6,000 in $500 monthly installments beginning on May 16, 2015

and on the sixteenth of each month thereafter until the balance was paid in full.[11]  If Debtor

defaulted in payment, the Stipulation allowed the Plaintiff, upon certification of default, to seek

entry of Judgment for $11,289, less any payments.[12]

On September 21, 2015, Debtor advised the Plaintiff (and his wife) in writing that she had

missed the August 16, 2015 payment because:

> I did not have the money because of my unemployment status over
> the summer (I only work ten months a year).[13]

Debtor's September 21, 2015 letter indicates that she tried to contact Plaintiff earlier ("I sent out a

letter to inform you of this prior to the check due date, unfortunately I now know that you did not

receive it").[14]  The Debtor indicates that she had already sent the Plaintiff the $500 payment due

September 16, 2015 and asks that she be given another chance to perform under the Stipulation.[15]

Plaintiff did not agree to do so, nor did he cash the check.  Plaintiff produced as an exhibit a copy

of uncanceled check number 197 dated September 10, 2015 for $500 drawn on Debtor's and Mr.

Battle's *joint* bank account over an address of 84 North 19th Street, East Orange, New Jersey

07017 and payable to Plaintiff.[16]  In addition to evidencing this joint account, this check also

indicates that both the Debtor and Mr. Battle share the same address for this purpose.

---

[10] (*Id.* at ¶¶ 15-16; Trial Tr. 9:20-22.  See also Trial Tr. 95:7-13. Debtor's testimony to same effect and acknowledging the confusion as to the timing of the representations as to her employment status.)

[11] (D-3, Stip. of Settlement.)

[12] (*Id.*)

[13] (D-4, Letter, Sept. 21, 2015.)  At trial on August 29, 2018, the Debtor clarified her employment status.  She has been a public school teacher for Irvington public schools since 2005 at a current salary of $62,000 (which she evidently draws over ten months) but works in the summer months for the City of East Orange in the food service department and has done so for the past ten years (Trial Tr. 33:3-17; 47:12-48:12).  Debtor testified that, in 2015, her summer job ended early, and she telephoned Plaintiff at that point to tell him that she could not make the August payment of $500 on the Stipulation (Trial Tr. 43:13-44:23.)

[14] (D-4, Letter, Sept. 21, 2015.)

[15] (*Id.*)

[16] (D-1, Check. No. 197 for $500, Sept. 10, 2015.)

After Debtor's default, Plaintiff pursued collection in the State Court Action in August and in September 2015 obtained a judgment and sought to garnish her wages.[17]  On September 24, 2015, the Debtor filed a "Request for Wage Application Hearing" in the State Court Action in defense of the Plaintiff's attempt to garnish her wages.  Debtor's application (a filled-in form with Debtor's fill-ins underlined below) states in relevant part:

> I, <u>Linda Battle</u>, request a hearing on the wage application in the above matter because,
>
> <u>I was unable to make a payment due to being unemployed.  I have since returned to work and have already mailed a payment to the defendant. (Please see attached letter)</u>.[18]

It is not clear what occurred in the State Court Action between Debtor's September 24, 2015 "Request for Wage Application Hearing" and the March 29, 2016 petition date, although Plaintiff acknowledged three payments of $500 pursuant to the Stipulation (prior to the default in August 2015) and then garnishments totaling $1,700.77, resulting in a total credit of $3,200.77.[19]

## B.  The Bankruptcy Case and this Adversary Proceeding

Debtor filed the instant, voluntary, no-asset Chapter 7 case on March 29, 2016.  Debtor scheduled the Plaintiff as a general unsecured creditor on Schedule E/F for $9,788 out of $25,324 in general unsecured debt.  On Schedule I, Debtor stated that she had been employed as a teacher by the Irvington Board of Education, Irvington, New Jersey for six years.  Debtor scheduled a wage garnishment of $754 but did not identify the garnisher.  The Debtor identified her residence as 84 North 19th Street, East Orange, New Jersey 07017 (the "Property") and scheduled her

---

[17] The Plaintiff certified, in opposition to the Debtor's motion to dismiss this adversary proceeding, that he obtained a default judgment against Debtor and Mr. Battle in 2008 but that that Judgment was vacated for improper service (Pl.'s Obj. ¶¶ 10-15, Dkt. No. 7).  Plaintiff testified in a September 26, 2016 hearing in the State Court Action (Hr'g Tr. 6:6-9:16) that he obtained a judgment "first" in 2008 and again in 2015 (Pl.'s Proposed Findings, Ex. D, Dkt. No. 49); (see also Pl.'s Mot. to Compel, ¶ 9, Main Dkt. No. 14.)

[18] (P-3, Wage Appl. Hr'g, Sept. 24, 2015.  The September 21, 2015 letter is in evidence as D-1.)

[19] (P-7).

interest in this Property as "Joint tenant," even though she also inconsistently stated that she is the sole owner.[20]  Debtor produced as a trial exhibit an unrecorded first page of an August 27, 2010 Deed indicating that Debtor and Mr. Battle's son (also named Marvin) took title to the Property on or about that date.[21]  The Deed identified the grantee as "Linda Battle, Married and Marvin Battle, Jr., Single."[22]

The Chapter 7 Trustee, Barbara A. Edwards, Esq. (the "Chapter 7 Trustee"), issued a Report of No Distribution on July 28, 2016 and also abandoned Debtor's one-half interest in the Property.[23]  On January 9, 2017, the Court entered an Order discharging the Debtor from all debts except Plaintiff's, which is the subject of this adversary proceeding.[24]

The Plaintiff was active in the bankruptcy case.  He attended the April 28, 2016 meeting of creditors conducted by the Chapter 7 Trustee and asked the Debtor:

PLAINTIFF:        Do you know where [Mr. Battle] lives?

DEBTOR:          No.  I don't have his address, no, but he doesn't live with me anymore.

PLAINTIFF:        Do you know where he works?

DEBTOR:          No.  He changed jobs since we separated so I don't know.

PLAINTIFF:        What was his previous job?

DEBTOR:          I think it was Kearny Tire Company.

                          . . .

PLAINTIFF:        Was he a truck driver at one point?

DEBTOR:          Yes.

---

[20] (Pet., Sch. A/B, Main Dkt. No. 1.)
[21] (D-2, Deed, Aug. 27, 2010.)
[22] (*Id.*)
[23] (Main Dkt. No. 33.)
[24] (Order Discharging Debtor, Main Dkt. No. 55.)

PLAINTIFF:        And what was the name of that company?

DEBTOR:        That's the company, Kearny Truck Driving.  It's a tire company but he drove the trucks.[25]

Plaintiff also obtained an Order on July 26, 2016 compelling Debtor to answer discovery; an Order on August 15, 2016 to attend a Rule 2004 deposition; and an Order on October 13, 2016 extending time to file the Complaint.[26]  During the July 19, 2016 colloquy on Plaintiff's motion to compel Debtor's Rule 2004 examination, Debtor's counsel represented on the record, in Debtor's presence, that Debtor does not know where her "ex-husband" is.[27]  Plaintiff represented that he sought the Rule 2004 examination (among other things) to obtain Mr. Battle's address.[28]

Plaintiff timely filed the Complaint on September 19, 2016 during the pendency of his motion to extend time.[29]  Debtor filed a motion to dismiss the Complaint; Plaintiff objected, and Debtor responded.[30]  By Order entered on January 30, 2017, the Court granted in part and denied in part Debtor's motion to dismiss, treating the Plaintiff's objection as an Amended Complaint and striking all counts (which originally included counts seeking to deny Debtor a discharge under 11 U.S.C. § 727(a)), except for Count 1, which seeks to except the Debtor's debt to Plaintiff from discharge under 11 U.S.C. § 523(a)(2)(A).[31]  As noted, the amount of that debt, after giving effect to payments by the Debtor, is $8,088.23.[32]  After additional discovery and motion practice

---

[25] (Pl.'s Proposed Findings, Ex. A, 341 Mtg. Hr'g Tr. 10:2-15, Dkt. No. 49.)

[26] (Order, July 26, 2016, Main Dkt. No. 31); (Order, Aug. 15, 2016, Main Dkt. No. 40); (Order, Oct. 13, 2016, Main Dkt. No. 51.)

[27] (Pl.'s Proposed Findings, Ex. B, Hr'g Tr. 2:9-10 and 2:19-23, Dkt. No. 49.)

[28] (Pl.'s Mot. to Compel ¶ 11, Main Dkt. No. 14.)

[29] (Order, Oct. 13, 2016, Main Dkt. No. 51.) Order acknowledges that the Plaintiff timely filed his Complaint during the pendency of his motion to extend time.

[30] (Dkt. Nos. 6, 7, 8.)

[31] (Order, Jan. 30, 2017, Dkt. No. 10.)

[32] The parties initially stipulated at trial that the amount due at the time of the Stipulation was $11,289 and agreed that subsequent credits (for payments made after the Plaintiff and Debtor entered the April 13, 2015 Stipulation) totaled $3,200.77, leaving a balance of $8,088.23.  But during the discussion of the credits at trial, the parties used a different starting figure of $11,596.64, against which application of the $3,200.77 credit leaves a balance due of $8,395.87, a difference of $307.64.  That difference is not material to this decision and the Court will use the slightly lower stipulated amount.

(including rulings that Plaintiff's son, a non-lawyer, could not represent him in this adversary proceeding[33] and that Plaintiff was not entitled to attorney's fees[34]), the Court conducted a one-day trial on August 29, 2018.

### C.  The State Court Landlord/Tenant Proceedings as to Mr. Battle

During Debtor's bankruptcy case, the Plaintiff separately sought a wage garnishment against Mr. Battle.  On September 26, 2016, the State Court held a hearing on Mr. Battle's objection to wage garnishment.  Plaintiff appeared by telephone.[35]  That hearing became relevant to this case as discussed below.

At Mr. Battle's September 26, 2016 wage garnishment hearing, Mr. Battle was questioned extensively by the State Court as to various matters, including the status of his marriage (Mr. Battle said Debtor and he were separated since 2014 or 2015) and the level of contact he maintained with the Debtor.[36]  The State Court asked Mr. Battle twice why Debtor had called chambers multiple times about that hearing if Debtor and he were separated.[37]  Mr. Battle admitted, after prompting by the State Court, that Debtor and Mr. Battle still used a joint checking account and that Mr. Battle pays certain household expenses:

> THE COURT:        If you're separated, why are you using a joint checking?
>
> MR. BATTLE:       *Because I still pay the mortgage where I live at.*  Me and her have an agreement -- we have an agreement.  I'm not -- so we don't have any type of issues that we have to go to court, we have --

---

[33] (Dkt. No. 35.)

[34] The Court notes that Plaintiff again seeks recovery of collection costs under the Lease in his post-trial submissions. The Court previously ruled that Plaintiff is not entitled to attorney's fees because he was not represented by an attorney and the Stipulation does not provide for the recovery of collection costs.  (See Order, Oct. 11, 2017, Dkt. No. 37.) That ruling does not change because the Lease was not in evidence and, in any event, was superseded by the Stipulation.  The Stipulation does not provide for the recovery of collection expenses.  Accordingly, the Court confirms its ruling that Plaintiff is not entitled to any collection costs.

[35] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 3:1-25, Dkt. No. 49.)

[36] (*Id.* at 4:20-5:9 and 10:14-11:12.)

[37] (*Id.* at 10:1-11:25.)

| THE COURT: | Oh, no, *but you have a joint checking account.* |
| MR. BATTLE: | *Yes, -- Yes*, Judge.  Because we -- |
| THE COURT: | Why? |
| MR. BATTLE: | Yes, Judge.  We do.  The reason why he have a joint -- because we still have an -- |
| THE COURT: | She filed bankruptcy?  You guys are still living together under the same roof.  Aren't you? |
| MR. BATTLE: | No.  We're not living the same -- no. We're not.  No. We're not living together.[38] |

Mr. Battle also testified on September 26, 2016 that he lived at 9 Kenmore (no city given) and that Debtor lived at 84 North 19th Street,[39] which is the Property that the Debtor jointly owned with the younger Mr. Battle.  Mr. Battle stated that he never checked the balance in the joint checking account, that the account was used to pay the mortgage on the jointly owned Property, and that he simply gave Debtor money to pay the bills.[40]  But Mr. Battle then testified that he moved to 9 Kenmore "a couple of months ago" (around June 2016).[41]  Mr. Battle stated that his application for the instant hearing reflected different addresses (415 Halstead Street and 10 North 19th Street) because he "just signed" the application and "had my wife file all this."[42]  Adding to the confusion and inconsistency, Mr. Battle thereafter testified that 84 North 19th Street (the address of the Debtor's jointly owned Property) "is my mailing address" and "is still my home":

> That [84 North 19th Street] is my mailing address.  84 North 19th
> Street is still my home.  I use that as my primary mailing address.
> My license and everything is still to 84 North 19th Street because
> that's my primary mailing address.[43]

---

[38] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 14:15-15:5, Dkt. No. 49.)
[39] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 15:6-17, Dkt. No. 49.)
[40] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 16:6-17:5, Dkt. No. 49.)  ("She handles all the finances when it came to the house.  I just give money and she handle [sic] the bills." State Ct. Hr'g Tr. 17:4-5.)
[41] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 18:5-19, Dkt. No. 49.)
[42] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 18:20-19:14, Dkt. No. 49.)
[43] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 20:20-24, Dkt. No. 49.)

Mr. Battle then testified that Debtor and he separated "about three years ago" but filed no legal separation.[44]  The State Court expressed "serious reservations" about Mr. Battle's testimony that Debtor and he were separated:  "all indicia to the outside world, you and your wife are still together."[45]  The State Court ordered Mr. Battle to pay $450 as 10% security against $4,500 in back rent as a condition of vacating the wage garnishment and listing the matter for trial; in default of his paying that security, the State Court would allow the $11,289 judgment to stand against Mr. Battle.[46]  This Court shares those reservations about the credibility of both Mr. Battle and the Debtor.  Indeed, given this confusing and conflicting testimony, it strains credulity to believe that the Debtor did not know where Mr. Battle lived or worked when they shared these various interests and activities, including the joint checking account, a home (or "mailing") address and acted together in defending the State Court litigation.

### D.  **The August 29, 2018 Trial**

The Court conducted a one-day trial on Plaintiff's 11 U.S.C. § 523(a)(2)(A) claim on August 29, 2018 to determine:

(i)     whether Debtor made any fraudulent misrepresentations to Plaintiff while negotiating their April 13, 2015 Stipulation of Settlement with the intent that Plaintiff rely on them; and

(ii)     whether Plaintiff justifiably relied on these allegedly fraudulent misrepresentations when he reduced Debtor's debt in the April 13, 2015 Stipulation of Settlement.

These misrepresentations were expected to involve:

(i)     whether Debtor was a single parent separated from her husband and in a one-income household; and

(ii)     whether Debtor was unemployed at the time of the Stipulation.

---

[44] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 21:13-25, Dkt. No. 49.)
[45] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 22:19-22, Dkt. No. 49.)
[46] (Def.'s Proposed Findings, Ex. D, State Ct. Hr'g Tr. 22:1-25:16, Dkt. No. 49.)

## 1. **Debtor's Employment Status**

At the beginning of trial, Plaintiff questioned the Debtor about her marital and employment

status and whether she stated that she was unemployed at the time of the settlement negotiations

on April 13, 2015, as described in the following testimony:

| | |
|---|---|
| PLAINTIFF: | Do you remember saying that you was separated from your husband? |
| DEBTOR: | Yes, I do. |
| PLAINTIFF: | Unemployed? |
| DEBTOR: | That I was unemployed? |
| PLAINTIFF: | Yes. |
| DEBTOR: | I've never been unemployed, sir. |
| PLAINTIFF: | You never said you were unemployed? |
| DEBTOR: | No.[47] |

At this point, Plaintiff provided Debtor with a copy of her "Request for Wage Application

Hearing" dated September 24, 2015 and admitted into evidence as P-3.  In that application, Ms.

Johnson-Battle represents to the State Court that she was unable to make a settlement payment

[in August 2015] "due to being unemployed."  Thus, the Debtor's trial testimony that she never

said she was unemployed was directly contradicted by her statement to the State Court.

While being examined by her counsel, Ms. Johnson-Battle attempted to explain this

inconsistency by testifying that as a teacher, she has a ten-month employment period and is off

or "unemployed" during the summer.    She also testified that she normally had temporary

employment in the summer months, but that the funding for her temporary job ran out in August

2015 and she was unemployed for that month.  The Court understands the explanation but notes

---

[47] (Trial Tr. 10:18-11:1.)

that being a full-time teacher is not the same as being unemployed, whether the pay period is ten months or twelve months.   Further, Ms. Johnson-Battle's testimony while being examined by Mr. Smith was unequivocal – "I've never been unemployed, sir" – but her statement in the application to the State Court was directly to the contrary, and her explanatory testimony in this Court was less than satisfactory or compelling.

In sum, the Debtor's statement to the State Court that she was "unemployed" was at least incomplete and misleading, as she was employed as a full-time teacher then, as she is now.  Thus, this testimony raises additional credibility issues for the Court.

Putting credibility issues aside for the moment, later testimony as to the timing of her representation about "unemployment" by both Plaintiff and Defendant made clear that this statement was made to the State Court (and Plaintiff) *after* the Stipulation was entered into and therefore could not have been relied upon by Mr. Smith in entering into the Stipulation.  In this regard, upon questioning from the Court, Plaintiff testified that the Debtor did not make a representation about her unemployment until "later," i.e., not during the April 13, 2015 settlement negotiations, but rather during the summer of 2015, when she sought forbearance while not drawing her teacher's salary:

| | |
|---|---|
| THE COURT: | [O]ne question that I . . . wanted to ask Mr. Smith.  Mr. Smith, at the time that you entered into this stipulation of settlement what were the -- I know you talked about certain representations that you say were made by [Debtor], can you just summarize them for me again? |
| PLAINTIFF: | Well, [Debtor] said she was living in a household with one income. [The Plaintiff digresses]. . . .  Because she was -- only had one income coming in and because I wanted to give her a break and get some of my money, I decided to enter into the consent agreement. |
| THE COURT: | So, the point about being unemployed came up after that meeting? |

PLAINTIFF:        That came up after.[48]

The Court notes that Plaintiff's early testimony at the August 29, 2018 trial appeared to be as to Plaintiff's understanding of Debtor's employment at the time of the settlement negotiations on April 13, 2015, but was inconclusive.  Plaintiff's subsequent testimony that the Debtor's statement of her "unemployed" status was made "after" the settlement clears up that issue and is consistent with the timing of the default (August 2015) and $500 check date (September 10, 2015), which were both after the April 13, 2015 settlement.  Thus, Plaintiff did not and could not have relied on any representation by Debtor that she was unemployed in the summer of 2015 when he entered into the April 13, 2015 Stipulation.  Accordingly, that representation cannot form the basis of Plaintiff's nondischargeability claim.

### 2.  **Debtor's Marital Status and Sources of Income**

What remains is the asserted representations and omissions by the Debtor concerning her marital status and sources of income. Debtor initially testified that she told Plaintiff during the settlement negotiations that she was separated from her husband.[49]  However, at the end of trial, she denied even making that statement during the settlement discussions in April 2015.[50]  Thus, the Debtor gave inconsistent testimony on this issue as well.

Debtor further testified that Mr. Battle and she first separated in November 2011 and that "it has been on and off ever since.  He's there, he's not there but it officially started November 2011."[51]  Nonetheless, she also acknowledged that Mr. Battle and she have been married for fifteen years and are still married.[52]  She clarified that they never divorced but have informally "separated

---

[48] (Trial Tr. 94:5-22.)
[49] (Trial Tr. 10:18-20.)
[50] (Trial Tr. 95:7-22.)
[51] (Trial Tr. 14:20-22.)
[52] (Trial Tr. 14:16-15:3.)

numerous times" "[w]here he lived and resided somewhere else."[53] Further, according to the Debtor and her counsel, Mr. Battle had been living in the Debtor's home after the filing of her bankruptcy petition.[54]    Mr. Battle also testified that they were separated, but ultimately acknowledged that they used a joint checking account that he funded at least in part and that he used the Debtor's address as his address for at least certain purposes.

As to sources of income, the Debtor also testified that Mr. Battle gives her money as needed and in varying amounts:

| | |
|---|---|
| PLAINTIFF: | How much money does your husband give you on a weekly or monthly basis for support of the household? |
| DEBTOR: | He does not give me any money on a weekly basis and he gives me money monthly as needed. The first year that he left, he paid half of the mortgage every month. That was just the first year. Now he gives me money as I ask. We don't have as many children in the household as we did when he left.<br>. . .<br><br>As I just stated, the first year he paid half of the mortgage because when he left, we had six children in the home with me. He paid half of the mortgage which would have been $1,000 every month but that was it. He didn't give me anything towards the bills, the food, the clothing, any expenses, just the thousand for the mortgage.<br><br>After that, half of the children have left, they're grown. There's only three children left. *He gives me money as needed. It may be $500 this month, $600 next month. I don't get a legal child support and he does not pay half the mortgage anymore.* |
| PLAINTIFF: | During the 2004 examination hearing you and Mr. Witherspoon communicated that your husband did not provide you with money. Is that accurate? |

---

[53] (Trial Tr. 16:2-7.)
[54] (Trial Tr. 18:24-19:7; also filed as Debtor's Resp. in Supp. of Mot. to Dismiss, at 4, Dkt. No. 8.)

> DEBTOR:        I don't recall saying that. I just explained he has to give me money. He's legally married to me. We had six children.[55]

At this point, Plaintiff had Debtor read into the record, and the Court admitted into evidence, the following excerpt from a January 18, 2017 response by Debtor's counsel (labeled "Certification") in support of his motion to dismiss Plaintiff's Complaint:

> As discovery for the 2004 examination, [Debtor] stated that Mr. Battle moved back into the same household three months after filing of the petition. She testified that they sleep in separate rooms, consider themselves to be a separate couple. [Debtor] has indicated that they have separated several times and is not sure how long Mr. Battle will be residing in her home. While Mr. Battle helps with certain bills, it's speculation on how long he will be staying in her home before he moves out again.[56]

The Debtor then resumed her testimony, acknowledging that Mr. Battle and she have never sought legal separation:

> but my husband has lived with me. The last six years he's maybe lived there a year-and-a-half and that would consist of sleeping downstairs. Our youngest child is 15 years old. My husband has a three-year-old and a five-year-old because he's moved out and left me numerous times.[57]

Debtor further testified that she paid $500 toward the settlement from the joint account with Mr. Battle:

> I stated at one point we had no contact so that's how he would get me the money.
> . . .
> He would put it into the account and I would pay the bills -- [58]

Debtor elaborated on Mr. Battle's contact with her and his contributions:

> So, when we had -- like he would come to the home but we really -- like I didn't have much to say to him at that point. That's how he handled his part. And I guess in his case it was also his way of documenting that he was

---

[55] (Tr. 16:9-17:10 (emphasis supplied)). Debtor testified that the six children are: her daughter from a prior relationship; Mr. Battle's three sons from a prior relationship; and two children that Debtor and Mr. Battle had together (Trial Tr. 48:13-49:1). The six children stayed with the Debtor after Mr. Battle left the Property (Trial Tr. 48:25-49:1).

[56] (Trial Tr. 18:24-19:7; also filed as Debtor's Resp. in Supp. of Mot. to Dismiss, at 4, Dkt. No. 8.)

[57] (Trial Tr. 20:11-15.)

[58] (Trial Tr. 28:19-22.)

> giving me something if I took him to court. The joint account is still there.
> At this time it has a dollar and some change but at that time that was my
> only account so that was my primary account which is not now, but it was
> and it just so happens to be an account we shared.[59]

The Plaintiff also caused the Debtor to read into the record portions of the September 26,

2016 State Court hearing transcript in which the State Court was troubled by Mr. Battle's testimony

about his residence.[60]  Further, Debtor testified at trial that she did not report to the Chapter 7

Trustee at the meeting of creditors on April 28, 2016 that she received money from Mr. Battle

because, "I didn't know I was required to report that."[61]  Neither was any contribution from Mr.

Battle disclosed on Debtor's schedules.

The Plaintiff testified on direct examination that, when the Debtor and he met with a

mediator on April 13, 2015, the parties discussed "that I take a lesser amount than the judgment

because of what Mrs. Battle had said in regards to her finance, her marriage status."[62]  The Plaintiff

testified that Debtor "indicated that she was living on one income household and was separated

from her husband."[63]  This information factored into Plaintiff's decision to compromise his claim:

> Well, I wanted to recoup some of my money and if it was so that she
> was living on one income, then I'd agree to take less.[64]

As noted, the trial testimony revealed that Mr. Battle did make contributions to the Debtor,

even though they may have been sporadic and in varying amounts.  The testimony also confirmed

that Mr. Battle lived with the Debtor at certain times, that they were still married, that they shared

a joint checking account, that Mr. Battle contributed to the household expenses "as needed" and

---

[59] (Trial Tr. 29:7-15.)
[60] (Trial Tr. 29:16-33:2.)
[61] (Trial Tr. 36:5-14.)
[62] (Trial Tr. 65:16-18.)
[63] (Trial Tr. 65:21-22.)
[64] (Trial Tr. 66:1-2.)

that he used the Debtor's address as his.  Thus, the Debtor was not a single parent with one source of income.

In sum, the Court is confronted with the inconsistent, sometimes conflicting and often-changing testimony of the Debtor as to whether Mr. Battle lived with her and/or provided her with financial support -- and even whether she made any such statements during the settlement negotiations -- as contrasted with Plaintiff's consistent testimony that he entered into the settlement agreement and compromised his debt with the Debtor because she represented that she was a single parent with one income during those discussions.  Based on the trial testimony, the Court finds that these statements were in fact made by the Debtor and were not true, as the Debtor acknowledges that Mr. Battle made at least some contributions to her monthly expenses, even though they were on a less than consistent basis as to both timing and amount.  It is similarly undisputed that Ms. Johnson-Battle did not disclose any of these contributions to the Bankruptcy Court in her schedules.  Further, the Debtor remained married to Mr. Battle throughout this period (and through the trial).

Accordingly, in deciding this issue, the Court credits Plaintiff's testimony that he entered into this settlement on the basis of the Debtor's representations that she was a single parent with one income to support her household.  Neither statement was true as she was married and Mr. Battle provided at least some support to the Debtor, lived with her from time to time and they shared a joint checking account.  Plaintiff's reliance on those statements, after being unable to collect anything from the Debtor from 2007 to 2015, was understandable and justifiable in the circumstances.

## IV.    CONCLUSIONS OF LAW

### A.  The General Standards

Count One of Plaintiff's Amended Complaint alleges that the debt of Debtor to Plaintiff is nondischargeable because it was "obtained by false pretenses, a false representation, or actual fraud within the meaning of . . . § 523(a)(2)(A)."  Specifically, 11 U.S.C. § 523(a)(2)(A) provides that a discharge under Title 11:

> does not discharge an individual debtor from any debt --
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;[65]

The burden is on the plaintiff to prove by a preponderance of the evidence that a debt is nondischargeable.  *See Grogan v. Garner*, 498 U.S. 279, 288 (1991); *In re Hilley*, 124 Fed. Appx. 81, 82 (3d Cir. 2005).  "The overriding purpose of the Bankruptcy Code is to relieve debtors from the  weight of oppressive indebtedness and provide them with a fresh start.  Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors."  *Ins. Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1113 (3d Cir. 1995).  In a complementary manner, the purpose behind section 523(a)(2)(A) is "to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors."  *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010) (internal citations omitted).

---

[65] 11 U.S.C. § 523(a)(2)(A).

Although section 523(a)(2)(A) does not define the terms "false pretenses," "false representation" or "actual fraud," these are "common-law terms" that "imply elements that the common law has defined them to include." *Field v. Mans,* 516 U.S. 59, 69 (1995); *see also In re Purington,* 2012 WL 1945510 at *8 (Bankr. D.N.J. May 20, 2012) (in applying section 523(a)(2)(A), "courts have routinely inferred that a plaintiff must establish intent, reliance and materiality").

As to a false pretense, the courts have held that:

> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Polaschek*, 2012 WL 1569611 at *5 (Bankr. C.D. Ill. May 3, 2012) (internal citations omitted).

A false representation is somewhat different; i.e., a "false or misleading statement about something, usually with the intent to deceive." *Holden v. Altieri (In re Altieri),* 2012 WL 3595298 at *2 (Bankr. D.N.J. Aug. 20, 2012) (quoting *In re Dobrayel*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002)). "The elements comprising false representation are: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the debtor intended to deceive the creditor at the time the debtor received the money; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as a result of that reliance." *In re Showalter,* 86 B.R. 877, 880 (Bankr. W.D. Va. 1988). "[W]ords, both written and oral; conduct; and even omissions may all be found to constitute a material misrepresentation." *In re Hilton L. Stein, LLC,* 2011 WL 1299985 *6 (Apr. 4, 2011). A plaintiff,

however, "must demonstrate that the representation was one of existing fact and not merely an *opinion,* expectation or declaration of intention."[66]

Similar to and essentially combining the elements of false pretenses and false representation, an actual fraud "consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another -- something said, done or omitted with the design of perpetuating what is known to be a cheat or deception." *In re Purington*, 2012 WL 1945510 at *9 (quoting *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1293 (5th Cir. 1995)). In sum, "[a]lthough the terms 'false pretenses,' 'false representation,' and 'actual fraud' refer to different concepts, they are closely related and each requires a plaintiff to demonstrate 'proof of false or deceptive conduct, fraudulent intent, and justifiable reliance.'" *In re Altieri*, 2012 WL 3595298 at *2 (citing *In re Neale*, 440 B.R. 510, 521 (Bankr. W.D. Wis. 2010)).

### B.  Application of the Law to the Facts of this Case

In applying these standards in this case, the Court determines that the Debtor's obligation to Plaintiff under the Stipulation is nondischargeable.  First, Plaintiff entered into the Stipulation on the basis of Ms. Johnson-Battle's misrepresentations and omissions as to material facts; i.e., that she was a single parent with one income to support her family.  The facts established at trial demonstrate that Ms. Johnson-Battle was continuously married to Mr. Battle during the relevant time period; that he made contributions to the Debtor's household expenses, often on a monthly basis, although the time and amounts of these payments varied; and that they shared a joint checking account from which various household expenses were paid, including the mortgage on Ms. Johnson-Battle's then-residence and at least one of the $500 settlement payments made to

---

[66] *In re Showalter*, 86 B.R. at 880 (emphasis added), (citing *In re Criswell*, 52 B.R. 184, 197 (Bankr. E.D. Va. 1985).  *See also Field v. Mans*, 516 U.S. at 68-69).

Plaintiff.  Mr. Battle also lived with the Debtor from time to time (including recently) and used the

Debtor's address as his main address.  Thus, Ms. Johnson-Battle's statement that she was a single

parent with one income was not accurate or complete in that she was continuously married and she

also did not disclose the contributions from Mr. Battle.

The trial testimony further demonstrated that the Debtor knew that those statements and

omissions were material and not accurate when she made (or did not make) them and evidence an

intent to deceive.  Their materiality is plain (and her omissions were misleading) as they were the

basis of Plaintiff's compromise and they paint a sympathetic picture, combined with an inability

to pay.  Here, the Court finds that Ms. Johnson-Battle's inconsistent testimony as to these matters,

along with her at least misleading and incomplete statement to the State Court that she was

"unemployed," evidences her propensity to make statements in a light more favorable to her when

it benefits her position and then attempts to explain them away when an inconsistency is exposed.

Ms. Johnson-Battle's denial that she made these statements rings hollow, especially given the

inconsistences noted above, including her failure to include the contributions from Mr. Battle on

her submissions to the Bankruptcy Court.

Having determined that Ms. Johnson-Battle made these misrepresentations and omissions,

the Court also finds that Ms. Johnson-Battle intended that Plaintiff rely on them in entering into

the Stipulation and that Plaintiff was justified in doing so.  *In re Melendez,* 589 B.R. 260, 265

(Bankr. E.D. Pa. 2018) (and cases cited therein) ("intent to deceive" in a section 523(a)(2)(A)

action "may be inferred from the totality of the surrounding circumstances").  Just as the Debtor

knew that stating she was unemployed would evoke consideration and perhaps sympathy from the

State Court in connection with her wage garnishment, Ms. Johnson-Battle also knew that being a

single parent with one income was likely to have the effect of causing Plaintiff to compromise his claim, as he did.

As to justifiable reliance, Plaintiff testified that he relied on Ms. Johnson-Battle's statements as to her single parent, single income status in entering into the Stipulation; Plaintiff entered into the Stipulation "[b]ecause she . . . only had one income coming in and because I wanted to give her a break and get some of my money. . . ."[67]  After litigating and unsuccessfully seeking recovery from the Debtor for almost a decade, Plaintiff was justified in relying on these statements in compromising his claim by almost half in exchange for the promise of regular payments from the Debtor, who had avoided Plaintiff's collection efforts for years.  Here, in addition to the direct misrepresentations and omissions to Plaintiff as to her marital status and sources of income, the Court again finds significant that Ms. Johnson-Battle's submissions to the State Court as to her "unemployed" status (along with Mr. Battle's testimony as to his financial and living arrangements with the Debtor) were also severely questioned by the State Court.  In short, in choosing between Plaintiff's testimony on these issues and the Debtor's denials, the Court credits the testimony of Plaintiff.

Finally, there is no doubt that Plaintiff was damaged by the misrepresentations as he compromised his claim by over $5,000 (almost 50%) and agreed to accept payments over time in entering into the Stipulation.  However, the amount of these damages is less than straightforward in the circumstances of this case because the underlying judgment was generally for failure to pay rent and did not appear to be based on any type of fraud or be otherwise nondischargeable (although Plaintiff did also claim his property was damaged).  In any event, the underlying debt would likely be dischargeable in whole or in part if the parties had not entered into the Stipulation.

---

[67] (Trial Tr. 94:16-18.)

However, this case involves the somewhat unusual circumstance of the misrepresentations and omissions occurring in connection with the settlement of what appears to be an otherwise dischargeable debt.  Further complicating the issue is the limiting language of section 523(a)(2), which provides that the debt is nondischargeable only "to the extent obtained by" fraud.

In deciding this issue, the Court relies on *In re Biondo*, 180 F.3d 126 (4th Cir. 1999), where the Court held that a debt for legal fees (which is normally dischargeable) that had been compromised and settled on the basis of debtors' misrepresentations as to their ownership and control of certain assets was nondischargeable in its entirety under section 523(a)(2)(A).  Like this case, the settlement in *Biondo* provided for a significantly reduced claim (less than 50%) if all payments were made, but that the full amount could be owed if there was a default.  *Id.* at 129, 133-36.

In holding that the entire debt was nondischargeable (even though the original debt for legal fees would have been dischargeable), the Fourth Circuit determined that the fraud was in connection with the settlement agreement, which was akin to a novation, rather than the original agreement to provide legal services.  Thus, the settlement constituted a refinancing or extension of credit which was obtained by the fraud and was therefore nondischargeable in its entirety.  *Id.* at 132-33.  *See also In re Janney*, 557 B.R. 476, 479-81 (Bankr. M.D. La. 2016) (debt incurred pursuant to settlement of prepetition litigation that was based on debtor's misrepresentations and omissions relating to the operating status of his business was nondischargeable under section 523(a)(2)(A)); *In re Moore*, 365 B.R. 589, 599-601 (Bankr. D. Md. 2007) *aff'd* 347 Fed. App'x 971 (4th Cir. 2009) (entering into settlement agreement that included forbearance and a release was an extension of credit under section 523(a)(2)(A); debt under settlement agreement was based on omissions and misrepresentations as to status of deposit used to fund settlement).

24

This Court agrees with the reasoning of *Biondo* and the similar cases cited above. Accordingly, the Court finds that the entire debt of $11,289 of the Debtor to Plaintiff under the Stipulation, less payments of $3,200.77, or a balance of $8,088.23, represented an extension of credit and is nondischargeable under section 523(a)(2)(A) because Plaintiff entered into the Stipulation on the basis of Debtor's material misrepresentations and omissions as to her marital status and sources of income, on which Plaintiff justifiably relied to his detriment.

**V.**      **CONCLUSION**

For the foregoing reasons, the Court determines that the entire debt of the Debtor to Plaintiff under the Stipulation, or $11,289, less payments of $3,200.77, for a remaining total of $8,088.23, is nondischargeable under 11 U.S.C. § 523(a)(2)(A).  A conforming Order is being simultaneously entered by the Court.

/s/Vincent F. Papalia
VINCENT F. PAPALIA
United States Bankruptcy Judge

Dated: May 8, 2019

25